Filed 8/21/24  P. v. DODG Corp. CA1/4

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION FOUR

|  |  |
|---|---|
| THE PEOPLE et al.,<br><br>     Plaintiffs and Respondents,<br><br>v.<br><br>DODG CORPORATION et al.,<br><br>     Defendants and Appellants. | A163757, A164933<br><br>(Alameda County<br>Super. Ct. No. RG19022353) |

Based on alleged extensive code violations and unsafe conditions at residential rental properties in Oakland, plaintiffs the People of the State of California (the People) and the City of Oakland (the City) brought this civil action asserting public nuisance and tenant protection claims against defendants DODG Corporation (DODG) and SBMANN2, LLC (SBMANN2) (the corporate entities that own the properties) and Baljit Singh Mann and Surinder K. Mann (the individuals who own and operate the corporate real estate businesses).  After a bench trial, the trial court entered judgment for plaintiffs, issued a 5-year permanent injunction, and awarded nearly $4 million in civil penalties, as well as attorney fees and costs.

On appeal, defendants contend (1) the court lacked authority to award civil penalties, among other reasons because the City failed to exhaust administrative remedies, (2) the alleged failure to exhaust requires reversal

1

of the entire judgment, including the injunction, (3) the court erred in imposing personal liability on the Manns, (4) the civil penalty award for one of the properties is excessive, and (5) the attorney fees award is defective.

We reverse in part and affirm in part.  We affirm the court's liability findings and the injunction, but we conclude much of the civil penalty award must be reversed as unauthorized by the applicable Oakland ordinances. We remand for recalculation of the civil penalties to the extent there was authority to impose them.  Our disposition on the civil penalties issue obviates any need to address whether the penalty was excessive at a single property.  Finally, due to our partial reversal of the judgment, we vacate and remand the attorney fees award for reconsideration by the trial court.

## I. BACKGROUND[1]

### A. *The Defendants' Real Estate Business*

Defendants Baljit Mann and Surinder Mann (who are husband and wife) have owned and managed real estate in Oakland since 1980.  They are corporate officers and shareholders of several closely held entities that own, manage, or rent out real property in Oakland, and for some of those they are the sole officers.  The entities have common management and an Oakland office that Surinder Mann oversees.  In total, at the time of trial, the companies owned about 130 properties in Oakland, 30 to 60 of which were residential.

Two of the closely held entities are defendants DODG and SBMANN2. Baljit Mann is the president of DODG, and Surinder Mann is its vice president and chief financial officer.  They are also the sole managing

---

[1] We derive our summary of the background facts in part from the trial court's statement of decision, as well as the underlying trial evidence.

2

members of SBMANN2. DODG and SBMANN2 own over 60 parcels in Oakland.

Plaintiffs' claims in this case arise from defendants' alleged real estate practices at six Oakland properties: 276 Hegenberger Road, 5848 Foothill Boulevard, 5268-5296 Foothill Boulevard, 5213-5219 International Boulevard, 1921 International Boulevard, and 1931 International Boulevard. DODG owns five of the six properties, all but 5213-5219 International Boulevard, which is owned by SBMANN2.

The trial court found that Baljit Mann frequently visited leased properties (sometimes daily or weekly), at least through May 2018. He made oral rental agreements and was a primary tenant contact for some properties. He also coordinated maintenance and communicated with the City about violations. Surinder Mann managed office operations, including supervising employees, signing leases, and negotiating move-out agreements with tenants.

B. *The Properties and the Alleged Violations*

### 1. 276 Hegenberger Road

At the commercial property it owned at 276 Hegenberger Road (a warehouse), DODG created residential units without permits and rented them to residential tenants. At least one residential tenant lived at the property for 15 years.

In early 2018, City inspectors from the Planning and Building Department's Code Enforcement unit ("Code Enforcement") and the Fire Prevention Bureau ("FPB") discovered there were people living in about 15 units at the property. There was evidence of long-term residential occupancy, including beds, toys, clothes, and kitchens and bathrooms in active use.

3

Inspectors discovered numerous significant code violations affecting health and safety, including water intrusion; windowless sleeping rooms; no heat; no smoke or carbon monoxide detectors; no hot running water; improperly vented water heaters; lack of ventilation; hazardous electrical wiring; and nonfunctioning fire extinguishers. Inspectors described the conditions at 276 Hegenberger as "by far the—the worst that I [have] seen," and as "a nine [out of ten], being a very dangerous building for people that were living in it . . . ."

After the inspections, FPB issued Fire Inspection Reports and Code Enforcement issued an Order to Abate to DODG, listing the code violations and informing DODG that "uninhabitable conditions on the premises represent a serious threat to the health, life safety, and welfare of the occupants and the public." FPB also directed DODG to place the building on a "fire watch," requiring observation for signs of fire, and to install basic fire safety equipment immediately. Apart from complying with these emergency measures, DODG did not abate the remaining violations, and families continued to live at the property.

Code Enforcement issued a Notice of Substandard/Public Nuisance Declaration in May 2018, again instructing DODG to abate violations and discontinue residential use. In response, Baljit Mann met with City officials and agreed to address the violations through a compliance plan. Tenants remained at the property, so Code Enforcement "red-tagged" the warehouse, posting notices to occupants that the building was unsafe to occupy. By July 2018, the last of the residential tenants moved out.

### 2. 5848 Foothill Boulevard

5848 Foothill Boulevard is a commercial building that DODG converted to residential use without permits. In 2016, Code Enforcement discovered violations at the property and found evidence of residential use.

4

Between 2016 and 2019, Code Enforcement and FPB issued notices of violation, orders to abate, and fire inspection reports identifying code violations, which included water intrusion, no smoke detectors, a nonfunctioning elevator, and out-of-date fire safety equipment.

### 3. 5268-5296 Foothill Boulevard

The property at 5268-5296 Foothill Boulevard was owned by DODG beginning in April 2017 (and had been owned since 2006 by OakVel Enterprises, a real estate holding company affiliated with the Manns). The building initially included only commercial units, which were later converted to live/work units. But the trial court found that defendants rented out the live/work units "to residential tenants without first installing an FPB approved sprinkler system (or obtaining an exemption) as required by the Fire Code [citation], despite the Planning and Building Department's express and repeated instructions to do so as part of the property's conversion from commercial to live/work."

In November 2018, an inspection by Code Enforcement revealed code violations, including missing smoke detectors and emergency lights, unsecured exterior doors, and an unpermitted water heater. In December 2019, City inspectors observed significant violations that presented a severe fire risk, causing FPB to order a "fire watch" for the property.

The trial court noted that inspectors found "no smoke and carbon monoxide detectors, emergency lights, exit lighting, fire alarm, or functioning fire extinguishers, and holes in the ceilings and walls throughout the property, all violations of the Fire Code." "Fire sprinklers were present but not hooked up to a water source, rendering them useless."

In addition, there were violations of housing and health and safety standards, including cockroaches in electrical panels, nonfunctioning heat, noncompliant electrical systems, improper ventilation of gas appliances, and

5

unapproved alterations, including room partitions and stairways. The trial court found that a tenant in one of the units was responsible for unapproved alterations in her unit (and the court did not impose liability on defendants for the alterations in that unit), but many of the violations were in common areas or in other units.

After the December 2019 inspection, Surinder Mann negotiated lease terminations with tenants in four of the illegally converted units. The agreements required tenants to consent to a full release of claims, and DODG did not inform tenants of their right to relocation payments.

### 4. 5213-5219 International Boulevard

SBMANN2 owns the property at 5213-5219 International Boulevard, which contains multiple structures. After a fire damaged one of the units, the City sent a notice of violation about the fire damage in July 2018. A reinspection in April 2019 revealed the other buildings were being used for unpermitted residential use, with power supplied through unapproved electrical work. SBMANN2 did not apply for permits until September 2020.

### 5. 1921 and 1931 International Boulevard

1921 and 1931 International Boulevard are "adjacent but distinct properties" owned by DODG. In April 2019, City emergency personnel responding to a fire at a nearby building discovered at least 10 tenants living in unpermitted residential units behind street front commercial spaces.

DODG rented to residential tenants at the property as early as February 2018. Unsafe conditions and code violations included inadequate egress, no sprinkler system or fire alarm, hazardous plumbing and electrical wiring, and no heat. The City "red-tagged" the residential units, instructing tenants to vacate, in addition to issuing notices of violation and orders to abate. The City later made relocation payments to some of the tenants.

6

## C. *Procedural Background*

The People and the City, both represented by the Oakland City Attorney, filed the complaint in this action on June 10, 2019. The complaint named as defendants DODG, SBMANN2, Baljit Mann, and Surinder Mann. The complaint asserted claims based on conditions at the properties discussed above and alleged (1) violations of Oakland's Tenant Protection Ordinance (TPO) (Oakland Mun. Code, § 8.22.600 et seq.) (first cause of action), and (2) public nuisance under both state and municipal law (Code Civ. Proc., § 731; Civ. Code, §§ 3479, 3480, 3491, 3494; Oakland Mun. Code, chs. 1.08, 8.22, 15.08) (second cause of action).[2] The complaint sought civil penalties, injunctive relief, restitution, and attorney fees and costs.

After a 13-day bench trial in April 2021, the trial court issued a statement of decision on September 1, 2021. The court found the defendants liable under the TPO and under public nuisance law. Specifically, based on the conditions and defendants' conduct at the properties described above, the trial court found defendants violated the TPO, including by failing to provide "housing services," failing to make timely repairs, and breaching the covenant of quiet use and enjoyment. (§ 8.22.640, subd. (A)(1), (2), (3), (10).)

The court found that defendants acted in bad faith (i.e., their conduct was " 'willful, reckless, or grossly negligent' ") and that their conduct constituted a " 'pattern and practice' " of violating the TPO (§ 8.22.670, subd. (A)(2)). In addition to the TPO violations, the court found defendants created a public nuisance, as defined by state law and in Oakland's building

---

[2] The City brought the first cause of action for violation of the TPO, while both the People and the City brought the second cause of action for public nuisance.

Undesignated section and chapter references are to the Oakland Municipal Code.

7

and maintenance codes, at most of the properties at issue. (See Civ. Code, §§ 3479–3480.)

As to relief, the court held that two different portions of the Oakland Municipal Code—the TPO (§ 8.22.600 et seq.) and chapter 1.08 (§ 1.08.010 et seq.)—authorize daily civil penalties. The court concluded daily penalties of between $250 and $1,000 were appropriate (for differing time periods) based on the violations at the several properties at issue. In a judgment entered on September 23, 2021, the court imposed civil penalties totaling $3,987,550.

The total consisted of (1) an award of $3,797,050 against DODG, with Baljit Mann jointly liable for $1,385,500 of this amount, and Surinder Mann jointly liable for $448,000, and (2) an award of $190,500 against SBMANN2, with Baljit Mann and Surinder Mann jointly liable for this full amount.

The court also issued a five-year permanent injunction on September 1, 2021, pursuant to the TPO and state public nuisance law. The injunction requires defendants to cure outstanding violations, reform their property management practices, make relocation payments to tenants, and submit regular reports to the City, as well as barring defendants from committing future violations.

On October 19, 2021, defendants filed a notice of appeal challenging the trial court's September 1, 2021 injunction order and the September 23, 2021 judgment (initiating appeal No. A163757).

The trial court later granted plaintiffs' motion for attorney fees on February 1, 2022, and entered an amended judgment on March 10, 2022 that includes the amounts awarded as fees and as statutory costs. The court awarded $2,375,491.50 in attorney fees and $24,456.01 in statutory costs.

Defendants appealed the fee order and the amended judgment (initiating appeal No. A164933). We consolidated defendants' two appeals.

## II. DISCUSSION

### A. *The Trial Court's Authority To Award Relief*

Defendants' principal argument on appeal is that, because the City failed to follow required administrative procedures under chapter 1.08, the trial court exceeded its authority (or otherwise erred) by awarding civil penalties and injunctive relief, requiring reversal of the entire judgment.

Defendants frame this contention in a variety of ways, asserting the City failed to exhaust administrative remedies; the City "failed to satisfy multiple statutory due-process-based preconditions"; and the trial court violated the primary jurisdiction doctrine. Among these various arguments is that Chapter 1.08 "doesn't authorize the *court* to impose civil penalties at all." For their part, plaintiffs contend that both chapter 1.08 and the TPO authorize the imposition of civil penalties in a civil action, rather than just the administrative assessment of civil penalties. They further contend that defendants' arguments based on exhaustion and similar principles provide no basis for reversal of any part of the judgment.

In resolving the claim that the court exceeded its authority, we start with first principles. Courts have authority to (1) use common law or equitable remedies that have not been abolished or replaced by statute, and (2) create judicial remedies where a statutory procedure to enforce a right is lacking. (3 Witkin, Cal. Procedure (6th ed. 2024) Actions, § 3 ["A judicial remedy available at common law or in equity may still be available in the absence of a statute abolishing or superseding it [citation]; and a remedy may be entirely created by judicial decision where a statutory procedure for the enforcement of a right is lacking."].)

9

With civil penalties, we do not have a remedy that was available at common law or in equity. Setting aside the equitable relief awarded here— the injunction—the sole relief sought and obtained here was by authority of legislative enactment, to wit chapter 1.08 and the TPO.  The parties presuppose, and we agree, that if the civil penalties awarded here are not authorized by one or both of these legislative enactments, the court exceeded its authority.  In the absence of legislatively conferred authority, there is no inherent judicial authority to award civil penalties as a remedy for adjudicated violations of these ordinances.

As we explain below, the only "statutory procedure" made available to obtain civil penalties is to seek their imposition administratively and then enforce those penalties in court, not to seek their imposition in court in the first instance.  To the extent the defendants frame this problem as a matter of exhaustion of remedies or primary jurisdiction, we reject those contentions.  We see the problem, more fundamentally, as a matter of lack of judicial power to award civil penalties where that remedy was not legislatively authorized—until Oakland Ordinance No. 13608 was passed in July 2020 amending the TPO to authorize the city attorney to seek civil penalties in a civil action.

### 1. Chapter 1.08 Does Not Authorize the Trial Court's Award of Civil Penalties

We turn first to whether chapter 1.08 (entitled "Civil Penalties" and consisting of §§ 1.08.010–1.08.090) provides a basis for an award of civil penalties in a civil action, as the plaintiffs contend, or only an administrative assessment of civil penalties followed by enforcement of those penalties in court, as the defendants contend.  The trial court adopted the plaintiffs' position.  We reach the opposite conclusion.

10

In addressing this issue, we have no occasion to address the parties' arguments as to whether the City failed to exhaust administrative remedies, failed to comply with any required administrative prerequisites to obtaining relief under chapter 1.08, or lacked jurisdiction under the primary jurisdiction doctrine. Based on our interpretation of Oakland Municipal Code, chapter 1.08, we conclude the civil penalty award must be vacated for lack of judicial authority to issue it.

Our review here is de novo. " 'We interpret ordinances by the same rules applicable to statutes.' " (*Amaral v. Cintas Corp. No. 2* (2008) 163 Cal.App.4th 1157, 1183.) These rules are well established. We look first to the language of the statute, striving to give significance to every word and phrase (*Copley Press, Inc. v. Superior Court* (2006) 39 Cal.4th 1272, 1284) and giving the language " 'a plain and commonsense meaning' " (*New Cingular Wireless PCS, LLC v. Public Utilities Com.* (2016) 246 Cal.App.4th 784, 795). " 'We do not, however, consider the statutory language in isolation; rather, we look to the entire substance of the statutes in order to determine their scope and purposes. [Citation.] That is, we construe the words in question in context, keeping in mind the statutes' nature and obvious purposes. [Citation.] We must harmonize the various parts of the enactments by considering them in the context of the statutory framework as a whole.' " (*Ibid.*) Courts liberally construe remedial statutes with a view to their protective purposes. (*Mahan v. Charles W. Chan Ins. Agency, Inc.* (2017) 14 Cal.App.5th 841, 860–861.) But "[a] mandate to construe a statute liberally in light of its underlying remedial purpose does not mean that courts can impose on the statute a construction not reasonably supported by the statutory language." (*Meyer v. Sprint Spectrum L.P.* (2009) 45 Cal.4th 634, 645).

We conclude chapter 1.08 authorizes City officials to assess civil penalties administratively and allows the assessed penalties to be collected through a court action, but the chapter does not authorize the city attorney to seek in a civil action the judicial imposition or assessment of civil penalties in the first instance. Section 1.08.010 states the purpose of chapter 1.08 is to provide "an alternative method of code enforcement" to abate violations of certain laws.[3] Section 1.08.020, subdivision (A) specifies that the chapter "authorizes the *administrative assessment* of civil penalties to effect abatement" of (among other things) violations of certain Oakland municipal codes (including building and housing codes, as well as the TPO, which is a portion of the city's health and safety code) and public nuisances. (§ 1.08.020, subd. (A), italics added; see § 1.08.030, subds. (A), (B) [incorporating state law public nuisance standards].)

Section 1.08.040 provides more detail about the authority for administrative penalties, stating that when a "major violation" exists at a property, "administrative civil penalties may be assessed to effect abatement" (§ 1.08.040, subd. (A)), and that "[t]he City Manager, or his or her designee, is authorized to assess civil penalties administratively in accordance with the procedures established in this Chapter" (*id.*, subd. (B)). Other provisions in chapter 1.08 describe those procedures, including stating that an "assessment notice" about the alleged violations is to be served on "the responsible person" (i.e., the person or entity responsible for

---

[3] Section 1.08.010 states: "The purpose of this Chapter is to provide for the protection, health, safety, and general public welfare of the residents of the City and to preserve the livability, appearance, property values, and social and economic stability of the City by providing an alternative method of code enforcement to effect abatement of violations of the laws, codes, ordinances and regulations identified in this Chapter."

causing the alleged violation) (§ 1.08.050, subds. (A), (B), (D); see § 1.08.030, subd. (D)), and that the responsible person may request an administrative hearing to adjudicate the assessment of civil penalties (§ 1.08.080, subd. (A)), a hearing that will result in a "final and conclusive" determination about civil penalties (*id.*, subd. (C)). Chapter 1.08 also specifies rules and factors that are to govern the amount and duration of civil penalties, while authorizing the city manager to establish guidelines on those issues. (§ 1.08.060.)

Taken together, the provisions of chapter 1.08 establish a detailed scheme for the administrative assessment of civil penalties by the city manager or a designee to abate certain code violations and public nuisances. The chapter does not set out any comparable express authorization for a civil action by the city attorney to request a court to impose or assess civil penalties. Chapter 1.08 thus differs from the San Francisco Municipal Code section at issue in *City and County of San Francisco v. Sainez* (2000) 77 Cal.App.4th 1302, 1309 (cited by the trial court and plaintiffs), which expressly provided that a civil penalty for a housing code violation was to be "assessed and recovered" in a civil action brought by the city attorney. Unlike the municipal code provision at issue in *Sainez*, chapter 1.08 does not authorize the civil penalties awarded by a superior court.

The provisions of chapter 1.08 cited by the trial court here (and by plaintiffs in their appellate brief)—sections 1.08.040, 1.08.020, 1.08.090, and 1.08.010—do not persuade us to the contrary. As noted, section 1.08.040 provides for the assessment of "administrative civil penalties" (§ 1.08.040, subd. (A)) and authorizes the city manager or a designee "to assess civil penalties administratively in accordance with the procedures established in this Chapter" (*id.*, subd. (B)). Then, subdivision (G) of the section (which is

13

cited by the trial court and by plaintiffs) states: "Civil penalties and related administrative expenses, including attorneys' fees, shall accrue to the account of the responsible department [i.e., the department responsible for enforcing the code provisions at issue] and *may be recovered* by all appropriate legal means, including but not limited to nuisance abatement lien and special assessment/priority lien of the general tax levy, or *by civil and small claims action brought by the City*, or both." (§ 1.08.040, subd. (G), italics added; see § 1.08.030, subd. (C) [definition of "responsible department"].)

We do not agree that the italicized language in section 1.08.040, subdivision (G) establishes a parallel authorization (separate from the administrative assessment process) for the city attorney to file a civil action requesting the judicial imposition or assessment of civil penalties. Instead, in our view, the most logical reading of section 1.08.040, subdivision (G)—in light of its reference to the "recover[y]" of civil penalties that have "accrue[d] to the account of the responsible department," and its placement at the end of a section that authorizes the *administrative* assessment of civil penalties—is that it authorizes a court action as one of several methods to collect penalties that have already been assessed through the administrative process that chapter 1.08 describes in detail. The statutes cited by plaintiffs as purportedly analogous to chapter 1.08 are materially different. Those statutes expressly provide that a civil action may be brought as an alternative to the administrative assessment of civil penalties (Lab. Code, § 2699, subds. (a), (e)(1)) or they simply authorize a court action to recover penalties with no reference to an administrative assessment process (Health & Saf. Code, § 43154, subd. (b)).

The trial court and the plaintiffs note chapter 1.08 does not specify that the administrative assessment of civil penalties is an exclusive mechanism, and indeed sections 1.08.090 and 1.08.020, subdivision (B) state the remedies authorized by chapter 1.08 are not exclusive, while section 1.08.010 states that chapter 1.08 provides "an alternative method of code enforcement" to abate violations. But these non-exclusivity provisions do not alter our conclusion as to the scope of chapter 1.08. Section 1.08.090 provides: "Remedies under this Chapter are in addition to and do not supersede or limit any and all other remedies, civil or criminal. The remedies provided for herein shall be cumulative and not exclusive. The enforcement official shall have the discretion to select a particular remedy to further the purposes and intent of the chapter, depending on the particular circumstances. The enforcement official's decision to select a particular remedy is not subject to appeal." Similarly, section 1.08.020, subdivision (B) states: "Civil penalties established in this Chapter are in addition to any other administrative or legal remedy which may be pursued by the City to address violations of the codes and ordinances identified in this Chapter."

In our view, these provisions do not support a conclusion that chapter 1.08 *itself* authorizes the city attorney to pursue a civil action seeking judicial imposition or assessment of civil penalties. Instead, sections 1.08.090 and 1.08.020, subdivision (B) make clear that nothing in chapter 1.08 eliminates, or precludes the City from pursuing, remedies that may be available under other provisions of law. Plaintiffs observe that section 1.08.090 states an enforcement official may select a remedy "to further the purposes and intent of the chapter," but that does not provide a basis to find that chapter 1.08 itself authorizes multiple remedies or avenues of relief that its text does not provide for. Instead, section 1.08.090

15

contemplates that any remedies provided by chapter 1.08 or by other law (including both "civil or criminal" "remedies") remain available, and an enforcement official may choose among them.

As to section 1.08.010's statement that chapter 1.08 provides "an alternative method of code enforcement," we find it significant that chapter 1.08 appears in the Oakland Municipal Code along with chapters 1.12 and 1.16, and that all three chapters impose administrative sanctions to abate code violations and public nuisances. (§§ 1.08.020, subd. (A) ["administrative assessment of civil penalties"], 1.12.020, subd. (A) ["administrative assessment of citations," i.e., smaller monetary sanctions], 1.16.020, subd. (A) ["administrative limitation of the use of property," i.e., withholding permits and recording violation notices].) Each chapter states it provides an "alternative method of code enforcement" (§§ 1.08.010, 1.12.010, 1.16.010); they provide the city manager with enforcement authority and include similar notice and administrative hearing procedures (§§ 1.08.040, 1.08.050, 1.08.080, 1.12.040, 1.12.050, 1.12.080, 1.16.040, 1.16.050, 1.16.080); and chapters 1.08 and 1.12 include provisions governing the amount and duration of monetary sanctions (§§ 1.08.060, 1.12.060).

In light of the parallel structure of these three companion chapters authorizing administrative remedies for overlapping types of violations, we think the "alternative method of code enforcement" language in each chapter (§§ 1.08.010, 1.12.010, 1.16.010) means only that the enforcement method it provides is (1) an alternative to the enforcement methods described in the other two related chapters, and (2) an alternative to other modes of enforcement authorized by sources of law outside this portion of the Oakland Municipal Code, such as a civil action authorized by state public nuisance law (see Civ. Code, §§ 3479, 3480, 3491, 3494). We do not

16

read the "alternative method of code enforcement" language in section 1.08.010 as supporting a conclusion that chapter 1.08 *itself* should be read as containing multiple methods of code enforcement, such as a parallel civil action remedy that is not expressly authorized by the chapter's text.

We also note (and we take judicial notice of) a new chapter—chapter 1.10—that was added to the Oakland Municipal Code in 2023 (after the decision under review here). (Evid. Code, §§ 452, subd. (b), 459, subd. (a).) Chapter 1.10 (which is found immediately after chapter 1.08 and before chapter 1.12) expressly authorizes the city attorney to seek, and the court to award, civil penalties in a civil action alleging code violations or public nuisances. (§§ 1.10.10, 1.10.20, subds. (C)–(F).) In our view, although this new enactment post-dates the trial court's judgment in this case, the express grant of authority in chapter 1.10 is consistent with our conclusion that there is not a similar grant of authority to be found in chapter 1.08 for a court to award civil penalties in the first instance.

For the above reasons, we conclude chapter 1.08—a scheme for the administrative assessment of civil penalties—does not authorize an award of civil penalties in this civil action by the city attorney.[4]

## 2. The TPO's Authorization of Civil Penalties

As noted, the court found both the TPO *and* chapter 1.08 authorized an award of daily civil penalties. Although the court found it could impose "separate overlapping penalties" under these two portions of the municipal

---

[4] We therefore have no occasion to address defendants' arguments that (1) the court should not have imposed civil penalties under chapter 1.08 because most of the nuisance conditions allegedly had been abated by the time of trial, and (2) a judicial award of civil penalties under chapter 1.08—*if* otherwise permitted—had to be *preceded* (under exhaustion or other principles) by an administrative assessment of penalties or other administrative prerequisites.

17

code, the court stated that "in the exercise of its discretion" it would "impose[] a single daily penalty where both TPO and nuisance claims overlap." Accordingly, despite our conclusion that chapter 1.08 does not authorize the court's penalty award, as explained above, we must consider whether the award may be upheld under the TPO.

To begin with, we reject defendants' argument that the award of penalties under the TPO must be reversed because it was "infected" by the court's alleged errors in applying chapter 1.08. As defendants point out, in setting the amount of the penalty award, the court stated that it was imposing penalties under both the TPO and chapter 1.08, and that it was "guided in the exercise of its discretion in assessing penalties by the factors listed in [section 1.08.060, subdivision (E)]" (i.e., a provision of chapter 1.08).[5] The court's consideration of these factors (which are not spelled out in the TPO itself) was a reasonable exercise of discretion and did not taint the TPO penalty award.

Defendants next contend that, because chapter 1.08 authorizes the assessment of civil penalties for TPO violations (see § 1.08.020, subd. (A)(1)), the City had to comply with any procedural requirements set forth in chapter 1.08 before it could seek relief under the TPO. We disagree. The TPO states that it may be enforced using the remedies set forth in the TPO

---

[5] The cited provision states: "E. Civil penalties shall be assessed based upon the following factors: [¶] 1. The duration and frequency of recurrence of the major violation; [¶] 2. The detrimental effects of the major violation on the occupants of the property and the surrounding neighborhood and the community at large; [¶] 3. The history of compliance efforts by the responsible person to correct the major violation wholly and permanently; [¶] 4. The viability of the civil penalty to effect abatement of the major violation wholly and permanently; [¶] 5. Other factors that serve justice." (§ 1.08.060, subd. (E).)

18

itself, including a civil action by the city attorney.  (§§ 8.22.650, subd. (A),
8.22.670, subds. (A), (C).)  Here the City did not enforce the TPO via
chapter 1.08 but brought a separate TPO claim.  And as discussed above,
chapter 1.08 itself states that the remedies it provides are cumulative, not
exclusive.  (§§ 1.08.090, 1.08.020, subd. (B); see § 1.08.010 [ch. 1.08 provides
"an alternative method of code enforcement"].)

There remains, however, the question whether, in a civil action to
enforce the TPO, the city attorney may seek a judicial award of civil
penalties.  The current version of the TPO, which was enacted by the
Oakland City Council on July 21, 2020, expressly authorizes this relief.
(§ 8.22.670, subd. (A)(2); see Oakland Ord. No. 13608, § 2 & Att. A.)  But the
parties dispute whether such relief is available for TPO violations prior to
that date, which include the vast majority of the violations at issue here.[6]

---

[6] The trial court imposed the following civil penalties:

(1) $1,000 per day for DODG for violations at 276 Hegenberger Road,
for the period *from June 10, 2016, through January 25, 2019* (with Baljit
Mann jointly liable *through May 1, 2018*);

(2) $1,000 per day for DODG for each of the two parcels at 1921
International Boulevard and 1931 International Boulevard, for the period
*from February 1, 2018, through July 10, 2019* (with Baljit Mann jointly
liable *through May 1, 2018*);

(3) $750 per day for DODG for 5848 Foothill Boulevard for the period
*from June 10, 2016, through December 17, 2019*, and then continuing at
$500 per day for that property *through May 28, 2021* (with Baljit Mann
jointly liable *through May 1, 2018*);

(4) $350 per day for DODG for 5268-5296 Foothill Boulevard for the
period *from July 30, 2016, through December 24, 2020* (with Surinder Mann
jointly liable *through January 2020*); and

(5) $250 per day for SBMANN2 for 5213-5219 International Boulevard
for the period *from August 1, 2018, through September 1, 2020* (with Baljit
Mann and Surinder Mann jointly liable for this entire period).

The city attorney enforcement provision in the original version of the TPO (enacted in 2014) authorized the city attorney to enforce the TPO by filing a civil action "for injunctive relief or damages, or both." (Former § 8.22.670, subd. (A)(2), as enacted by Oakland Ord. No. 13265, Nov. 5, 2014.) In a different sentence, the provision stated: "The City Attorney may also request that an administrative citation or civil penalty be issued by the City." (*Ibid.*)[7] In the current TPO, the city attorney enforcement provision (1) includes an amended first sentence stating the city attorney's civil action may seek "equitable relief, restitution and/or penalties" (instead of "injunctive relief or damages, or both"), (2) follows that amended sentence with a new sentence stating a court may award civil penalties of up to $1,000 per day for violations of specified provisions of the TPO, and (3) retains unchanged the sentence allowing the city attorney to "request that an administrative citation or civil penalty be issued by the City." (§ 8.22.670, subd. (A)(2).)[8]

---

[7] Former section 8.22.670, subdivision (A)(2) stated: "The City Attorney may enforce the TPO through civil action for injunctive relief or damages, or both, for when the party against whom enforcement is sought has a pattern and practice of violating the TPO. The City Attorney may also request that an administrative citation or civil penalty be issued by the City. The City Attorney has the sole discretion to determine the cases appropriate for enforcement by the City Attorney's Office." (Former § 8.22.670, subd. (A)(2).)

[8] Section 8.22.670, subdivision (A)(2) states: "The City Attorney may enforce the TPO through civil action for equitable relief, restitution, and/or penalties when the party against whom enforcement is sought has a pattern and practice of violating the TPO. A court may award civil penalties of up to one thousand dollars ($1,000.00) per day for each violation of subsection 8.22.640 A., B., E., G., or H. A court may award punitive damages in a proper case as set out in Civil Code Section 3294 and pursuant to the standards set forth in that Code Section or any successor thereto. The City

In its 2021 statement of decision, the trial court concluded the TPO authorizes the city attorney to seek civil penalties in the present enforcement action "for the duration of violations at each property," because the July 2020 amendment to the TPO "clarifie[d]" the city attorney's "existing authority" to seek civil penalties under the TPO.[9] Plaintiffs similarly urge this conclusion in their appellate brief. Defendants dispute this view, arguing that the prior version of the TPO "did not authorize civil penalties" and that application of the amended version would be improper and would violate due process.

Here, too, our review is de novo. We independently review "whether an amended statute applies to conduct that predates its enactment." (*Scott v. City of San Diego* (2019) 38 Cal.App.5th 228, 235.) As a general rule, statutes do not operate retroactively "unless the Legislature plainly intended them to do so." (*Western Security Bank v. Superior Court* (1997) 15 Cal.4th 232, 243 (*Western Security*).) But "[a] statute that merely clarifies, rather than changes, existing law is properly applied to transactions predating its enactment." (*Carter v. California Dept. of Veterans Affairs* (2006) 38 Cal.4th 914, 922 (*Carter*).) "Such a statute 'may be applied to transactions predating its enactment without being considered retroactive' because it 'is merely a statement of what the law has always been.'" (*In re Marriage of Fellows* (2006) 39 Cal.4th 179, 183.)

---

Attorney may also request that an administrative citation or civil penalty be issued by the City. The City Attorney has the sole discretion to determine the cases appropriate for enforcement by the City Attorney's Office." (§ 8.22.670, subd. (A)(2).)

[9] Because defendants had not argued this issue, the trial court did not analyze the question in detail.

21

In determining whether a statute clarified or changed the law, we consider the Legislature's intent in enacting the statute, as well as " 'the surrounding circumstances.' " (*Fellows, supra,* 39 Cal.4th at p. 184.) "One such circumstance is when the Legislature promptly reacts to the emergence of a novel question of statutory interpretation." (*Western Security, supra,* 15 Cal.4th at p. 243; accord, *Carter*, *supra*, 38 Cal.4th at p. 930 [amendment was a "prompt and clear response to an appellate court's contrary interpretation of the statute"].) "The Legislature's declaration of an existing statute's meaning, while not dispositive, is a factor entitled to consideration." (*Fellows,* at p. 184.)

In *Carter*, *supra*, 38 Cal.4th 914, where the Legislature had stated its intent in enacting an amendment was to clarify existing law, the Supreme Court examined the former statute to determine whether it "could not have been properly construed" to have the meaning the amended version had. (*Id.* at p. 924.) The court concluded the original statutory language was ambiguous and both parties had made "credible arguments in favor of their positions" as to its meaning (*id.* at p. 926); the legislative history of the original provision also did not disclose a clear legislative intent (*id.* at pp. 928–930). This ambiguity, combined with the Legislature's statement of intent in the amended statute and its prompt response to an appellate court's contrary interpretation, led the Supreme Court to conclude the amendment merely clarified existing law. (*Id.* at p. 930; see *In re J.C.* (2016) 246 Cal.App.4th 1462, 1479–1480 [where there were credible arguments in favor of both interpretations of former statute, the amendment "must be regarded as clarifying, rather than changing," existing law].)

We conclude the July 2020 ordinance that amended the TPO to include express authorization for the city attorney to seek civil penalties in a civil action—Oakland Ordinance No. 13608—changed the TPO on that point, rather than merely clarifying it. The ordinance includes no statement by the city council that the amendments made to the TPO were intended to clarify existing law or to correct a contrary interpretation.[10] And, in our view, the former TPO is not reasonably susceptible to an interpretation that it authorized the city attorney to seek civil penalties in a civil action.

As noted, former section 8.22.670, subdivision (A)(2) included a sentence authorizing the city attorney to file a civil action "for injunctive relief or damages, or both" and a different sentence stating the city attorney "may also request that an administrative citation or civil penalty be issued by the City." We think it clear that the latter sentence authorizes the city attorney to seek administrative remedies (including civil penalties) through administrative proceedings (i.e., to ask that they be "issued by the City"). We disagree with plaintiffs' suggestion that the reference to a "civil penalty" in that sentence provides a basis to conclude it is an available remedy in a civil action.

We are not persuaded by plaintiffs' argument that, because administrative civil penalties are authorized, it "follows" that the city attorney could seek civil penalties in court, where greater procedural and evidentiary protections apply. The city council listed two sets of remedies

---

[10] We note that, if anything, the recitals in the ordinance suggest the city council aimed to strengthen the TPO because it previously was too weak and did not sufficiently punish and deter violators. (Oakland Ord. No. 13608, pp. 1–2.) But these statements are brief, and it is not clear they are directed to the specific change at issue here, so we do not attach great significance to them. We conclude only that there is no evidence the city council's intent was to enact a mere clarification of the law.

that were available through different channels.  It is not our role to second-guess that decision or to determine how well suited the judicial forum might have been for the assessment of civil penalties if the city council had authorized that relief.

Returning to the sentence in former section 8.22.670, subdivision (A)(2) that lists the remedies available to the city attorney in a civil action, plaintiffs contend the reference there to "damages" should be read to mean civil penalties, "because the City, as a government enforcement agency, does not suffer 'damages' as a result of a TPO violation."  We disagree.  While it may not be clear what type of "damages" would be recoverable by the city attorney under the former TPO, we decline to read that term to mean the distinct remedy of civil penalties.  (See *Limon v. Circle K Stores Inc.* (2022) 84 Cal.App.5th 671, 702 [damages are intended to compensate, while civil penalties are intended to punish the wrongdoer and deter misconduct].)  Treating the terms as synonymous would be especially inappropriate here, where the city council used the term "civil penalty" in a different sentence in former section 8.22.670, subdivision (A)(2).  (*Limon*, at p. 701 [" ' " 'Ordinarily, where the Legislature uses a different word or phrase in one part of a statute than it does in other sections or in a similar statute concerning a related subject, it must be presumed that the Legislature intended a different meaning.' " ' "].)

For the foregoing reasons, we conclude Oakland Ordinance No. 13608, the July 2020 ordinance amending the TPO to authorize the city attorney to seek civil penalties in a civil action, was a change to the TPO, rather than a mere clarification.  Accordingly, applying it to events preceding its enactment would be an improper retroactive application.  (*McClung v. Employment Development Dept.* (2004) 34 Cal.4th 467, 474.)  Retroactive

application is only proper if that is the clear legislative intent.  (*Id.* at p. 475 [" '[A] statute may be applied retroactively only if it contains express language of retroactivity or if other sources provide a clear and unavoidable implication that the Legislature intended retroactive application.' "].)  "Of course, when the Legislature clearly intends a statute to operate retrospectively, we are obliged to carry out that intent unless due process considerations prevent us."  (*Western Security, supra,* 15 Cal.4th at p. 243.)

Plaintiffs do not argue that the Oakland City Council intended the July 21, 2020 amendment to the TPO's city attorney enforcement provision to apply retroactively, and Oakland Ordinance No. 13608 does not include a statement or other evidence of such intent.[11]  We therefore need not address whether a retroactive application would implicate due process concerns.

Because the TPO amendment authorizing the city attorney to seek civil penalties in a civil action took effect on July 21, 2020 (see Oakland Ord. No. 13608, § 11) and does not operate retroactively, we will vacate the civil penalty award and remand for the trial court to recalculate it.  Daily civil penalties under the TPO may be awarded for violations that continued on or after July 21, 2020 (which the court found occurred at some properties).[12]

---

[11] The amended text of a different provision of the TPO— section 8.22.640 (which lists prohibited acts of tenant harassment)—states that certain subdivisions of that section "shall apply beginning April 21, 2020."  (§ 8.22.640, subd. (A).)  There is no similar statement or other evidence supporting retroactive application of the amendments to the city attorney enforcement provision.

[12] Defendants suggest the version of the TPO in effect when plaintiffs filed their complaint in 2019 must be applied to all violations, even those continuing after the TPO amendment took effect in July 2020.  We reject this argument.  Imposing penalties for violations that occurred after the amendment took effect is not a retroactive application of the law.  The cases cited by defendants on this point do not hold to the contrary.  (*Morris v.*

25

Having concluded that the civil penalties for violations before July 21, 2020 must be vacated, we need not address defendants' separate argument that the penalties for 276 Hegenberger Road (which were for violations between 2016 and 2019) were excessive because there were no authorized tenancies during a portion of that period.

### 3. The Injunction

Relying on exhaustion and other doctrines, defendants contend that plaintiffs' alleged failure to follow administrative procedures in chapter 1.08 and other municipal code provisions—such as seeking the administrative assessment of civil penalties, making official public nuisance declarations, or including certain information in abatement notices—rendered the court powerless to award civil penalties or issue injunctive relief "under OMC Chapter 1.08."

Contrary to defendants' assertion, the court did not rely on chapter 1.08 as authority for the injunction.[13]  Instead, the court found injunctive relief was authorized by the TPO (§ 8.22.670, subds. (A)(2), (C)) and by state public nuisance law (Code Civ. Proc., § 731; Civ. Code,

---

*Pacific Electric Railway Co.* (1935) 2 Cal.2d 764, 768–769 [defendant was entitled to application of contributory negligence rule that existed at the time of the accident]; *Wexler v. City of Los Angeles* (1952) 110 Cal.App.2d 740, 747 [applying wrongful death statute that was in effect on date of decedent's death]; see *Wells Fargo & Co. v. City & County of San Francisco* (1944) 25 Cal.2d 37, 41 [statute that would have immediately cut off plaintiffs' right of action could not be applied, because it did not allow a reasonable time after the effective date for the exercise of the right].)

[13] Chapter 1.08 (which, as discussed, pertains to the administrative assessment of civil penalties) does not authorize injunctive relief.

§ 3491).[14]  As discussed in part II.A.2, *ante*, any procedural prerequisites for obtaining administrative civil penalties under chapter 1.08 provide no basis to preclude judicial relief under the TPO, which has always (both before and after the July 2020 amendment) authorized the city attorney to seek injunctive relief in a civil action.  (§ 8.22.670, subds. (A)(2), (C); former § 8.22.670, subds. (A)(2), (C).)

And, as plaintiffs point out, defendants make *no* challenge in their opening appellate brief to the finding of liability and resulting injunction under state public nuisance law.  Their summary argument on the point in their reply brief (based again on exhaustion), even if it were properly raised, is not persuasive.  Defendants have not shown that any procedural requirements for seeking an administrative civil penalty under chapter 1.08 should be viewed as negating the state law provisions authorizing the city attorney to seek injunctive relief.  (Code Civ. Proc., § 731; Civ. Code, § 3491.)[15]

## B. *Liability for the Manns*

Defendants contend the trial court erred in holding Baljit Mann and Surinder Mann were liable (along with the corporate defendants) for some of the violations established at trial.  We conclude the court did not err.

---

[14] In its statement of decision, the court stated that a provision of Oakland's building maintenance code—section 15.08.080, subdivision (F)—also authorized injunctive relief.  But in the permanent injunction itself, the court stated it was issuing the injunction pursuant to the TPO and the state statutory provisions cited above.

[15] Because civil penalties were the only relief granted by the trial court under chapter 1.08, and because we have concluded the penalty award must be reversed on other grounds, we need not address the parties' arguments as to whether the City complied with any required administrative prerequisites to obtaining relief under chapter 1.08.

27

The TPO provides in section 8.22.640, subdivision (A) that, "No Owner or such Owner's agent, contractor, subcontractor, or employee, shall do any of" the listed prohibited acts (such as failing to provide housing services and failing to make timely repairs) "in bad faith." (§ 8.22.640, subd. (A).) The trial court concluded, in part based on this provision, that liability under the TPO is not limited to a property owner and that "an agent or representative of a corporate entity may be liable under the TPO for his or her own affirmative conduct, even if such conduct was within the scope of their employment." The court continued: "Mere passive shareholder or director status, however, is not sufficient for liability under the TPO, since the agent or representative must 'do' one or more of the prohibited types of harassment in bad faith to be liable." The court found Baljit Mann and Surinder Mann played active individual roles in committing many of the violations and held they were liable (for specified timeframes at certain properties) based on their personal conduct.

Defendants argue this result runs afoul of the "corporate privilege" allowing shareholders to be shielded from a corporation's liabilities, because the court found the Manns liable without concluding they were alter egos of the corporate defendants. We disagree. Where a statute imposes liability on an individual for his or her own acts, it is no defense that the alter ego doctrine would not *also* make the individual liable for a corporation's acts. (*Atempa v. Pedrazzani* (2018) 27 Cal.App.5th 809, 825 ["[T]he unambiguous language of the statutes at issue applies to Pedrazzani as an 'other person' subject to the civil penalties. [Citations.] Contrary to Pedrazzani's suggestion, the *inapplicability* of the alter ego doctrine is not a defense to the statutory liability of a party who otherwise qualifies as an 'other person' subject to a civil penalty under" the statutes at issue.].) In this

28

circumstance, the common law alter ego doctrine is inapplicable. (*Ibid.* ["Pedrazzani's individual liability did not result from a corporate debt or obligation based on what Pedrazzani describes as 'disregarding the corporate form' under the common law"; instead, individual liability resulted from evidence showing the defendant qualified as a person liable for civil penalties under the relevant statutes].)

Here, the court did not find that the Manns, by virtue of their status as shareholders, were vicariously liable for the obligations of DODG or SBMANN2. Instead, the court imposed liability on the Manns for their own conduct and carefully separated the roles of the individual defendants at each property (in some cases determining personal liability was appropriate for one but not the other at a given property). (For example, at one property, the court found Baljit Mann acted as DODG's "agent"; the property was "under his 'control' "; and he "personally communicated with the tenants at the property." In contrast, there was "no evidence" that Surinder Mann "had any involvement in this property other than as a passive office manager/director.") The court acted properly and did not violate alter ego principles.[16]

Defendants next argue the trial court misinterpreted the TPO as authorizing individual liability for persons other than property owners. We

---

[16] We do not hold the Manns are personally liable for their own acts under a negligence or other tort theory (see *Frances T. v. Village Green Owners Assn.* (1986) 42 Cal.3d 490, 503–504), so we need not address the parties' arguments as to whether such liability would be appropriate here. We hold only that the trial court's findings about the Manns' conduct bring them within the category of persons (including property owners *and* their agents) who are prohibited by the TPO from committing specified acts. (§ 8.22.640, subd. (A).) Their liability is based on the TPO, as the trial court held.

29

agree with the trial court's interpretation. As noted, section 8.22.640, subdivision (A) prohibits not only an "Owner" but also an "Owner's agent, contractor, subcontractor, or employee" from committing the listed prohibited acts. An agent thus can violate the TPO through his or her own actions. And the remedy provisions of the TPO authorize relief against anyone who violates the TPO (not just a property owner). (§ 8.22.670, subds. (C) ["Any person who commits an act, proposes to commit an act, or engages in any pattern and practice which violates the TPO may be enjoined therefrom by any court of competent jurisdiction."], (A)(2) ["The City Attorney may enforce the TPO through civil action for equitable relief, restitution, and/or penalties when the party against whom enforcement is sought has a pattern and practice of violating the TPO."].) An agent of a property owner may be found liable under the TPO for the agent's own conduct.[17]

Defendants' contrary interpretation of the TPO is incorrect. They assert the TPO defines "Owner" to mean "owner of record." Not so. The TPO defines "Owner" (by reference to a definition of "Landlord" in a related code provision) to *include* an owner of record, other specified persons, and "an agent, representative, or successor of any of the foregoing." (§§ 8.22.620, 8.22.340.) And in any event, as noted, an "Owner" is not the only person who can violate the TPO. An "agent, contractor, subcontractor, or employee" of the owner can too. (§ 8.22.640, subd. (A).)

Defendants argue that what section 8.22.640, subdivision (A) means is that an owner is liable for the acts of its agents and employees. But that is

_____

[17] We need not address the parties' arguments as to whether chapter 1.08 also authorizes individual liability, because we have concluded chapter 1.08 does not support the trial court's award of civil penalties as against any of the defendants.

30

not what the provision says. It does not discuss vicarious liability of owners (and does not purport to expand or contract agency law on that point). Instead, as noted, section 8.22.640, subdivision (A) identifies types of conduct and states that owners *and* their agents and employees are prohibited from engaging in that conduct. Section 8.22.670 then sets forth the remedies that are available against a person who violates the TPO (not just an owner). (§ 8.22.670, subds. (C), (A)(2).) Again, the TPO does not state that shareholders are personally liable for corporate debts or for the actions of other employees; it just holds individual agents and employees liable for their own conduct.

Defendants suggest the Manns' conduct as outlined by the trial court should not subject them to liability because they were acting "within the scope of their duties as corporate (and LLC) owners." But the court found based on the evidence that the Manns acted as "agent[s]" for DODG or SBMANN2 (again, at different times and for different properties), and defendants do not challenge the court's factual findings as to what they did or failed to do. The TPO prohibits specified conduct by an "Owner" or "such Owner's agent, contractor, subcontractor, or employee," and we see no basis to exclude from this language a person who plays an active role as an agent at a particular property just because they also happen to be a shareholder of the corporation. (See *Atempa v. Pedrazzani, supra,* 27 Cal.App.5th at pp. 825–826, 816–817 [finding individual defendant was liable for civil penalties, despite his claim he acted within the scope of his agency].)

Finally, we reject defendants' suggestion that plaintiffs' complaint did not make clear that individual liability was possible. The complaint names the Manns as defendants, along with DODG and SBMANN2; it alleges the

31

"defendants" violated the TPO; and it states injunctive relief and civil penalties are sought.

## C. *Attorney Fees*

In its order granting plaintiffs' motion for attorney fees, the trial court awarded $2,320,554 for the case in chief, based on a lodestar of $1,105,026 and a 2.1 multiplier. After adjustments, including an addition for work on the fee motion, the court awarded a total of $2,375,491.50 in attorney fees and $24,456.01 in statutory costs.

On appeal, defendants contend (1) reversal of any portion of the judgment requires reversal of the fee award, and (2) plaintiffs are not entitled to a multiplier. As to their second argument, defendants claim the multiplier is improper because the TPO's fee provision is "analogous" to Code of Civil Procedure section 1021.5 (which bars use of a multiplier when fees are awarded to a public entity in an action brought "pursuant to" that statute). Defendants further assert no multiplier should be awarded because the City is a public entity and did not face contingent risk in litigating the case. Plaintiffs respond by arguing that Code of Civil Procedure section 1021.5 does not apply here and the TPO fee provision (§ 8.22.670, subd. (D)(1)) contains no similar prohibition on multipliers. Plaintiffs further contend several factors justified the court's selection of a multiplier (while agreeing the contingent risk factor should not have been considered).

We agree with defendants' first argument—our vacatur of the substantial civil penalty award (which may be recalculated on remand, likely for a fraction of the time period covered by the initial award) requires reversal of the attorney fees award and a redetermination of the fee issue by the trial court. In awarding fees, the trial court noted plaintiffs "substantially prevail[ed]" in the action, which was complex and "was

32

heavily litigated, fully tried and resulted in a $3.9 million judgment and a broad 5-year city-wide injunction." And in deciding on the multiplier, the court again considered (as one of several factors) the results obtained by plaintiffs, noting they "succeeded in this case to an extraordinary extent, obtaining one of the largest judgments in a case like this as well as a broad injunction."

Since we are vacating a portion of the relief obtained by plaintiffs, we will vacate the fee award as well and remand for the trial court to reconsider it. (See *Ghirardo v. Antonioli* (1994) 8 Cal.4th 791, 808–809 [reversing damages award and remanding for reconsideration of fee issue].) For guidance on remand, we note the trial court retains broad discretion to set the amount of a fee award (*Amaral v. Cintas Corp. No. 2, supra,* 163 Cal.App.4th at p. 1217), and nothing in this opinion should be read as precluding a fee award of any size the court, in its discretion, applying the applicable lodestar criteria, deems warranted—including, if the court should so conclude, the same amount that it previously decided is warranted.

In particular, we reject defendants' view that no multiplier is permitted here. The "lodestar adjustment method" of calculating attorney fees permits use of a multiplier in certain circumstances to arrive at an appropriate fee. (*Ketchum v. Moses* (2001) 24 Cal.4th 1122, 1134 (*Ketchum*).) The lodestar (" 'i.e., the number of hours reasonably expended multiplied by the reasonable hourly rate' ") " 'may . . . be adjusted, based on consideration of factors specific to the case, in order to fix the fee at the fair market value for the legal services provided.' " (*Ibid.*) Contrary to defendants' suggestion, it is not necessary for the applicable statutory fee provision to specify expressly that a multiplier may be used. (*Id.* at pp. 1135–1136.)

Here, the court awarded attorney fees under the TPO's fee provision, section 8.22.670, subdivision (D)(1), which authorizes an award of fees in an action under the TPO and contains no prohibition on the use of a multiplier.[18]  We reject defendants' contention that the limitation on multipliers specified in Code of Civil Procedure section 1021.5 (a limitation that, as noted, applies when fees are "awarded to a public entity pursuant to this section")[19] should be read to bar the use of a multiplier for an award under a different provision of law, specifically the TPO's fee provision, section 8.22.670, subdivision (D)(1).[20]  Code of Civil Procedure

---

[18] The court also cited chapter 1.08's fee provision, section 1.08.040, subdivision (G).  Defendants argue (and plaintiffs do not appear to dispute) that this provision is defective because it does not include prevailing party language required for a city ordinance to authorize fees in a nuisance action (see Gov. Code, § 38773.5, subd. (b)).  We need not resolve this issue, because the applicable TPO fee provision (§ 8.22.670, subd. (D)(1)) includes prevailing party language and supports a fee award here.

[19] The portion of Code of Civil Procedure section 1021.5 that addresses multipliers states:  "Attorney's fees awarded to a public entity pursuant to this section shall not be increased or decreased by a multiplier based upon extrinsic circumstances, as discussed in *Serrano v. Priest* [(1977)] 20 Cal.3d 25, 49."

[20] Our decision in *City of Santa Rosa v. Patel* (2010) 191 Cal.App.4th 65, cited by defendants, does not preclude application of a multiplier here.  In *City of Santa Rosa*, we held that, in calculating a city's fee award in a red light abatement action, the trial court should have used the lodestar method rather than a "cost-plus" approach.  (*Id.* at pp. 70–71.)  In reaching that conclusion, we discussed *Ketchum*, stating in a footnote that:  "The *Ketchum* court noted that fee awards to public entities may not be increased or decreased by a multiplier under Code of Civil Procedure section 1021.5." (*City of Santa Rosa*, at p. 71, fn. 4.)  In turn, *Ketchum* discussed Code of Civil Procedure section 1021.5 to support the conclusion that the "express restriction on the use of fee enhancements" in that statute " 'can be read as an implicit endorsement of their use in other contexts.' "  (*Ketchum, supra*, 24 Cal.4th at p. 1135.)  Our brief footnote in *City of Santa Rosa* does not

34

section 1021.5, which codifies the "private attorney general doctrine," is designed primarily for the situation in which "private enforcement is necessary because no public entity or official pursued enforcement or litigation" (*Robinson v. City of Chowchilla* (2011) 202 Cal.App.4th 382, 390), although the statute does provide for awards to public entities in some circumstances (Code Civ. Proc., § 1021.5). Here, public enforcement officials themselves brought this action, and they did not seek fees under Code of Civil Procedure section 1021.5. We decline to import that statute's restrictions to the different situation presented in this case.

Finally, in deciding to apply a multiplier here, the trial court relied on several factors that could continue to support a multiplier on remand. In addition to contingent risk (a factor we discuss further below), the court found superior representation had been provided, including finding that the hourly rates requested "should be augmented to take into account representation that would have been expected for a more senior level of experience." The court also found that counsel obtained exceptional results—including a "broad injunction" that we are affirming—and that the case "advanced the public interest." The court noted the case was publicly funded and "precluded other representation by the relatively small affirmative litigation unit of the City." Defendants do not argue that the court's findings on these matters are unsupported by the record. And consideration of such factors is supported by case law. (See *Ketchum, supra,* 24 Cal.4th at pp. 1132, 1139; *Serrano v. Priest, supra,* 20 Cal.3d at p. 49; *In re Lugo* (2008) 164 Cal.App.4th 1522, 1546.) "There is no magic formula;

_____

establish that a public entity is ineligible for a multiplier when seeking a fee award under a statute that contains no prohibition.

any one factor may justify an enhancement." (*Sonoma Land Trust v. Thompson* (2021) 63 Cal.App.5th 978, 986.)

As to contingent risk, the trial court found "this was a fully contingent case," because there was no guarantee plaintiffs would prevail and recover fees. Defendants argue the contingent risk factor should not have been considered, because the City's attorneys were salaried employees who did not face a personal risk of nonpayment. In response, plaintiffs (while arguing the other factors outlined above amply support a multiplier) state they "concede that the contingent-risk factor does not apply to this case and the trial court should not have considered it as a basis for awarding a multiplier."

In explaining their concession, plaintiffs do not adopt defendants' precise challenge to the contingent risk factor. Plaintiffs instead state the present case "is not a contingency fee case," and they "had no private counsel," so this case does not present concerns raised in case law about the need for neutrality of counsel bringing public nuisance actions. (See *County of Santa Clara v. Superior Court* (2010) 50 Cal.4th 35, 63–64 [specifying limits on contingent-fee arrangements between public entities and private counsel in public nuisance actions]; *People ex rel. Clancy v. Superior Court* (1985) 39 Cal.3d 740, 745.) Plaintiffs further state: "That the City and/or the People could potentially not prevail and recover fees did not influence whether the City and the People brought the case, or how it was prosecuted."

Plaintiffs explain—and we agree—that the *Clancy* and *County of Santa Clara* cases "highlight[] the importance of neutrality in government enforcement actions." But plaintiffs go on to emphasize an important distinction. "Here," they point out, "the compensation paid to the attorneys

36

who represented the [public entity plaintiffs] was not directly tied to the outcome of the case." We accept plaintiffs' concession on this point. Since this was not a contingency fee case and because the risk of nonpayment did not affect plaintiffs' decisions as to whether or how to pursue the case, the contingent risk factor does not itself support a fee enhancement. But we also agree with plaintiffs that, even if that factor is not considered, the other factors discussed above continue to provide, on remand, an ample basis for a multiplier on this record.

## III. DISPOSITION

The trial court's award of civil penalties and its award of attorney fees and costs are vacated and remanded for further proceedings consistent with this opinion. On remand, the trial court may recalculate the civil penalty award for violations on and after July 21, 2020. The court may also reconsider plaintiffs' request for attorney fees and costs and enter a new award as it deems appropriate. In all other respects, the judgment is affirmed, including the injunction against all defendants. The parties shall bear their own costs on appeal.

STREETER, Acting P. J.

WE CONCUR:

GOLDMAN, J.
HITE, J.*

---

* Judge of the Superior Court of California, City and County of San Francisco, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

37